**Electronically Filed
Intermediate Court of Appeals
29352
27-FEB-2013
07:46 AM**

NO. 29352

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, ex rel. MARK J. BENNETT,
Attorney General, on behalf of RUSS K. SAITO,
Comptroller, State of Hawai'i, Plaintiff-Appellant,
Cross-Appellee, and HAWAII GOVERNMENT
EMPLOYEES ASSOCIATION, AFSCME LOCAL NO. 152, AFL-CIO;
UNITED PUBLIC WORKERS, AFSCME LOCAL NO. 646, AFL-CIO;
ROYAL STATE NATIONAL INSURANCE COMPANY, LIMITED;
THE ROYAL INSURANCE AGENCY, INC.; VOLUNTARY;
EMPLOYEES BENEFIT ASSOCIATION OF HAWAII; MANAGEMENT
APPLIED PROGRAMMING, INC., Defendants-Appellees,
Cross-Appellants, and JOHN and JANE DOES
and DOE CORPORATIONS 1-100, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 02-1-0685)


MEMORANDUM OPINION
(By: Foley, Presiding Judge, and Leonard, J., and
Nakamura, C.J., concurring and dissenting)


From 1961 to June 30, 2003, the Hawaii Public Employees Health Fund (**Health Fund**) provided health benefit plans, including, *inter alia*, health and group life insurance, to public employees. See Hawaii Revised Statutes (**HRS**) Chapter 87 (repealed).[1] Beginning at various times, under the Health

---

[1] HRS Chapter 87 was repealed in 2001, effective July 1, 2003. 2001 Haw. Sess. L. Act 88 §§ 3, 4 & 10. For the sake of brevity, reference to Chapter 87's repeal is not repeated with each citation. The Health Fund was replaced by the Hawaii Employer-Union Benefits Trust Fund (**EUTF**). See HRS Chapter 87A.

Fund's "porting" program, State and county employees could elect to enroll in insurance plans provided through their unions, in lieu of Health Fund-sponsored plans. The Health Fund would then pay or "port" public funds to the unions for the public employers' contribution to the cost of providing such insurance. See HRS §§ 87-22.3, 87-22.5, and 87-23. In its current iteration, this action stems from the State's contention that, between 1994 and 2003, the funds ported to certain unions exceeded the amounts authorized by applicable law.

Plaintiffs-Appellants, Cross-Appellees, State of Hawai'i, *ex rel.* David M. Louie (**Louie**), Attorney General, and Dean H. Seki (**Seki**), Comptroller (collectively, the **State**) appeal from the September 29, 2008 Judgment Against Plaintiffs of the Circuit Court of the First Circuit (**Circuit Court**) and challenge various orders, including a July 9, 2008 Order Denying Plaintiffs' Motion for Summary Judgment and Granting Summary Judgment Against Plaintiffs (**Summary Judgment Order**).[2] Defendants-Appellees, Cross-Appellants, Hawai'i Government Employees Association, AFSCME Local 152, AFL-CIO (**HGEA**), and United Public Workers, AFSCME Local 646, AFL-CIO (**UPW**), and Defendants-Appellees, Cross-Appellants, Royal State Corporation (**Royal State**), Royal State National Insurance Company, Limited (**RSN**), The Royal Insurance Agency, Inc. (**TRIA**), Management Applied Programming, Inc. (**MAP**), and Voluntary Employees' Benefit Association of Hawaii (**VEBAH**), (collectively, **the Royal State Group**), seek relief from the Circuit Court's September 23, 2008

_____

[2] This suit was initially brought by former Attorney General Earl M. Anzai, and former Comptroller Glen M. Okimoto, on behalf of the State. After the substitution by former Attorney General Mark J. Bennett and former Comptroller Russ K. Saito, the nature of the suit changed from, generally speaking, an action seeking an accounting or audit to a suit alleging wrongdoing by the defendants. The present plaintiffs-appellants were substituted automatically pursuant to Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 43(c)(1).

order denying the defendants' motions for attorneys' fees and costs.

This case is rife with procedural complexities and strongly-worded accusations - by both "sides" against the other - of false representations, bad faith, and malintent.[3/] In an apparent attempt to more effectively and efficiently manage the litigation, the Circuit Court exercised its control over the proceedings in various ways, most notably by bifurcating the case into two parts. Before allowing the State to prosecute amended claims seeking, *inter alia*, damages, penalties, treble damages, restitution, constructive trust, and injunctive relief including partial reimbursement of ported funds, the Circuit Court required the State to first seek a declaratory ruling on the interpretation of the key phrase "actual monthly cost of coverage," as it is used in the statutes that authorized the porting.

As discussed below, the Circuit Court rejected the State's formulation of the statute. This question of statutory interpretation is the linchpin issue in this case because, absent the adoption of the State's interpretation of the statute (or one substantially similar to the State's interpretation), virtually all of the State's allegations of fraud and wrongdoing - which are grounded in the State's proferred definition of "actual monthly cost of coverage" - appear to have become legally untenable. Put another way, although the Circuit Court's statutory interpretation did not bar the State from pursuing other claims and theories of wrongdoing and recovery, it appears to have effectively gutted the State's case as the State sought to frame its claims.

---

[3/]     By noting the mutually acerbic tone of the parties' arguments, we imply no equivalence, favor, or disfavor, of the merits of their respective allegations.

We nevertheless conclude that the Circuit Court did not err in its interpretation of the term "actual monthly cost of coverage" in HRS §§ 87-22.3, 87-22.5, 87-23 and hold that, as used in Chapter 87 of the Hawaii Revised Statutes, this term means "the premium charged by and paid to the [insurance] carrier." We cannot, after-the-fact, judicially rewrite statutes to enable the State to allege violations of statutory provisions that were not even contemplated, let alone included, in the legislation that was passed and signed into law. Accordingly, we affirm this aspect of the Circuit Court's judgment. This issue is addressed more fully below, along with the other points raised by the parties to this appeal.

I. BACKGROUND

Prior to its participation in the Health Fund's porting program, an employee organization or union[4] was required to satisfy various criteria, including the submission, to the Health Fund Board of Trustees (**Board**), of a copy of the union's charter and by-laws, and a letter that:

> (1) Identifies the name and address of the person who is authorized to represent the employee organization;
>
> (2) Certifies that its heath benefits plan complies with all applicable State laws; and
>
> (3) Agrees that its heath benefits plan complies and will continue to comply with the following requirements:
>
>> (A) Maintain reasonable accounting and enrollment records and furnish such records and reports as may be requested by the board, its administrator, or the State comptroller;
>> (B) Permit representatives of the board and State comptroller to audit and examine its records that pertain to its health benefits plan at reasonable times and places as may be designated by the board or the State comptroller; and
>> (C) Accept adjustments for error or other reasons as may be required under chapter 87, Hawaii Revised Statutes, and chapters 30 through 36 of title 6, administrative rules.

---

[4] The terms "employee organization" and "union" are used synonymously herein.

Hawaii Administrative Rule (**HAR**) § 6-34-9 (health benefits plan); see also HAR §§ 6-35-5 (dental plan) & 6-36-7 (life insurance plan).

In June of 1989, HGEA submitted the requisite information, certification, and agreement, and identified Royal State as HGEA's representative with respect to its benefits plans. UPW filed similar certifications in June of 1989 and June of 1990. UPW also identified Royal State as UPW's representative with respect to the Health Fund benefit plans porting program.

The State contends that, during July 1, 1994 to June 30, 2001, the Health Fund transferred over $503 million to employee organizations, including HGEA and UPW, for the purpose of purchasing health benefit plans on behalf of their members. In May 1999, the State Auditor conducted an operational audit of the Health Fund and found that the Board had never audited the union health benefit plans, and therefore "falls short of fulfilling its fiduciary responsibility to carry out the purposes of the health fund." See HRS § 87-29 (Supp. 2002) (requiring the Board to "[m]aintain accurate records and accounts of all financial transactions of the fund which shall be audited annually and summarized in an annual report by the comptroller"). The Auditor's report stated that despite the State's significant interest, as evidenced by the "significant increases in premiums ported to union health plans," the Board had not requested that the unions provide information on their health benefit plans' operations. The report criticized the Health Fund for its lack of monitoring of the union plans and determined that the Board should "ensur[e] that the union plans are using the ported funds to provide health benefits, and are in compliance with the statutory requirements[.]" As a result of the Auditor's findings, the State Comptroller sent notices requesting that

5

participating unions, including HGEA, UPW, and others, make their records available for audit.

On January 3, 2002, the Comptroller sent letters to HGEA and UPW indicating that the State "has the duty and responsibility to investigate and ensure that public funds are properly appropriated, administered, and expended," as well as a "fiduciary, moral, and legal responsibility to ensure compliance with the provisions of Hawaii law regarding the porting of these public funds."  The letters stated that, pursuant to HAR §§ 6-34-9(b)(3)(B), 6-35-5(3)(B), and 6-36-7(3)(B), Health Fund representatives and the State Comptroller are authorized to conduct an audit of the employee organizations' records and that he would be exercising his discretion to conduct an audit of the union welfare benefit plans.

In response, UPW requested the legal authority for the audit, a specific list of requested records in order "to determine whether the records [the State] require[s] are subject to the audit," and "an agreement of the written procedure that [the State] will use to reimburse the UPW for the cost to the UPW to participate in the audit."  On February 8, 2002, the State sent letters indicating the scope of the audit and a list of the required financial records for the audit to HGEA and UPW.  On February 11, 2002, UPW again requested "a copy of the state and federal laws" that require UPW to submit the requested records to the State.  In a letter response dated March 1, 2002, the Comptroller again indicated his authority to perform an audit pursuant to the Board's administrative rules and further requested UPW to inform the Comptroller in writing whether it planned to honor its certification to the State that the records would be made available.  After further correspondence, UPW took the position that the State's articulation of its legal authority, and the purpose, scope, and objectives of the audit, had "not been satisfactorily resolved" and requested a copy of

the "RFP used in the procurement of an independent auditor and the contract with Ernst & Young to perform the independent audit."[5]   Similar exchanges occurred between the Comptroller and HGEA.

In March 2002, after issues regarding HGEA and UPW's failure to make records available for audit were not resolved, the Comptroller filed suit seeking access to the records needed for the audit (**Initial Complaint**).  HGEA, UPW, and Royal State were named as defendants.[6]   The Initial Complaint alleged violation of the Board's administrative rules, a right to an accounting, and breach of contract, breach of fiduciary duty, and promissory estoppel claims.  The State sought an order requiring the defendants and their agents to fully comply with the audit, to provide an accounting of the payments made by the Health Fund, and a decree of specific performance requiring HGEA and UPW to honor their certifications to make their records available for inspection.

The Circuit Court granted the State's motion for a preliminary injunction on April 23, 2002, and ordered UPW, HGEA, and their agents and representatives, to make their records available to the State for review and audit.

HGEA moved for clarification or instructions, claiming that VEBAH, its insurance representative, physically possessed the responsive records and refused to produce them because VEBAH is not an "agent" bound by the Circuit Court's order.  UPW joined HGEA's request.  On May 31, 2002, the Circuit Court granted HGEA's motion, instructing UPW and HGEA to issue and serve subpoenas duces tecum on VEBAH, TRIA, and MAP to produce the required documents.

---

[5]     Although not specified in the letter, "RFP" likely refers to a request for a proposal to provide the audit services.

[6]     RSN, TRIA, VEBAH, and MAP, affiliates of Royal State, were subsequently added as defendants.

Further discovery disputes between the parties followed. And, as more information became available to the State, the State filed various motions for leave to amend its complaint.

On January 18, 2006, the Circuit Court bifurcated the case into (1) a declaratory judgment action as to the meaning of the statutory provision "actual monthly cost of coverage," and (2) dependent upon the outcome of the declaratory ruling, an action on the State's remaining claims.

On July 9, 2008, after extensive litigation regarding the form of the State's complaint, the Circuit Court entered the Summary Judgment Order, concluding that the phrase "actual monthly cost of coverage" meant "the premium charged by and paid to the carrier[.]" On September 29, 2008, the Circuit Court entered its Judgment Against Plaintiffs. Timely notices of appeal and cross-appeal were filed thereafter.

II. POINTS OF ERROR

On appeal, the State raises the following points of error:

1. The Circuit Court erred when it incorrectly interpreted the term "actual monthly cost of coverage" from HRS §§ 87-22.3, 87-22.5, 87-23 to mean "the premium charged by and paid to the carrier";

2. The Circuit Court erred when it denied the State leave to file a second amended complaint and rewrote the State's complaint;

3. The Circuit Court erred when it held that the Attorney General's office had no attorney-client privilege over communications with the former Health Fund Administrator;

4. & 5. The Circuit Court erred when it granted in part Royal State, UPW, and HGEA's motions to compel;

6. The Circuit Court erred when it underestimated the costs of production from the State's expert; and

7. The Circuit Court erred when it refused to allow preparation costs for the State's expert's deposition.

On their respective cross-appeals, the Royal State Group, UPW, and HGEA each contend that the Circuit Court erred when it denied their requests for attorney fees' and costs.

III. APPLICABLE STANDARDS OF REVIEW

> Statutory interpretation is reviewed *de novo* by [the appellate] court. When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Moreover, it is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning.

Bhakta v. Cnty. of Maui, 109 Hawai'i 198, 208, 124 P.3d 943, 953 (2005) (internal quotation marks, brackets, and citations omitted).

The trial court's grant or denial of attorney's fees and costs is reviewed under the abuse of discretion standard. Sierra Club v. Dep't of Transp., 120 Hawai'i 181, 197, 202 P.3d 1226, 1242 (2009).

The allocation of the costs of discovery, like the taxation of other litigation costs, is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. See Eastman v. McGowan, 86 Hawai'i 21, 27, 946 P.2d 1317, 1323 (1997); Pulawa v. GTE Hawaiian Tel, 112 Hawai'i 3, 10-11, 143 P.3d 1205, 1212-13 (2006).

IV. DISCUSSION

A. The Actual Monthly Cost of Coverage

The threshold issue in this case is the meaning of the phrase "actual monthly cost of coverage," which appears in each of the statutory provisions governing the funds ported from the Health Fund to the unions. HRS § 87-22.3(2), governing union-sponsored health benefits plans, provides, in relevant part:

> For employee-beneficiaries who participate in the health benefits plan of an employee organization, the board of

> trustees shall pay a monthly contribution for each employee-
> beneficiary, in the amount provided in section 87-4(a), **or**
> **the actual monthly cost of the coverage**, whichever towards
> the purchase of health benefits under the health benefits
> plan of an employee organization.

(Emphasis added.)

The same language also appears in HRS § 87-22.5, governing dental plan benefits, and HRS § 87-23, governing group life benefits or group life insurance.

Pursuant to this statutory provision, the contribution ported to the union is the lesser of either: (1) the employer's contribution to the cost of insurance, as determined by the applicable collective bargaining agreement (see HRS § 87-4); or (2) the actual monthly cost of the coverage.

To illustrate how this would work, in principle, we adapt a hypothetical example discussed in the State's opening brief. First, say the applicable collective bargaining agreement provided that the public employer would pay 60% of the monthly health premiums for the unionized employees. This calculation was based on the monthly premium of the medical plan sponsored by the Health Fund, which in turn was defined as the plan with the largest number of active employee enrollments as of December 31st of the previous fiscal year. If the most popular plan's monthly premium was, say, $100, the amount ported to the union would be, at the most, $60. If, however, the "actual cost of coverage" of the union's health benefits plan was $50, then the maximum amount that could be ported under this statutory provision would be $50.

In the Summary Judgment Order, the Circuit Court ruled that the "actual cost of coverage" is "the premium charged by and paid to the [insurance] carrier." The State argues that the Circuit Court erred because the "actual cost of coverage" means the *real* cost of providing coverage, which should be interpreted as the fair market value of the coverage in an arm's length or bona fide business transaction. The State further argues that the definition of "actual cost of coverage" should take into

account not only the premiums charged by and paid to the insurance carriers, but also rate credits, reimbursements, refunds, reasonable profits, and reasonable administrative fees.

First, we note that there is no statutory definition of "actual cost of coverage" contained in Chapter 87. "The words of law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning." HRS § 1-14 (2009). As the Hawai'i Supreme Court has explained, when a "term is not statutorily defined, this court may resort to legal or other well accepted dictionaries as one way to determine its ordinary meaning." Gillan v. Gov't Emps. Ins. Co., 119 Hawai'i 109, 115, 194 P.3d 1071, 1077 (2008) (citations, brackets, and internal quotation marks omitted). According to Black's Law Dictionary, "actual" is defined as "[e]xisting in fact; real[.]" Black's Law Dictionary 40 (9th ed. 2009). "Cost" is defined as "[t]he amount paid or charged for something; price or expenditure." Id. at 397. "Coverage" plainly refers to the insurance coverage provided to the State employee who participates in the union's plan.

Although no ambiguity is apparent from these words, we necessarily consider the "statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." Lingle v. Hawai'i Gov't Employees Ass'n, Local 152, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005) (citation omitted). Citing the legislative history of the various enactments incorporating the actual-cost-of-coverage-if-it-is-lower concept in the Health Fund statute, the State argues that the purpose of this language was to, potentially, lower the cost of providing insurance. See, e.g., Sen. Stand. Comm. Rep. No. 893, in 1980 Senate Journal, at 1448 (actual monthly cost of coverage" language added to the statute governing children's

11

dental plans "may also have the effect of lowering employer contributions"). This proposition is true, in the sense that cost savings were viewed as a possible and desirable outcome. However, nothing in the legislative history of Chapter 87 even remotely suggests that the Legislature intended a meaning other than the plain meaning of "actual cost."

For reasons that are external to and independent from the words contained in the statute, the State essentially argues that we must read "actual cost of coverage" to include restrictions on the profits and administrative expenses of the insurers selected by the unions to provide coverage to the State employees. With this argument, the State alleges that the premiums charged for the union-sponsored plans were inflated and did not reflect the "actual value" of the coverage provided. Accordingly, the State argues that, in order to effectuate the "purpose, reason, and spirit behind the porting program," this court must conclude that "actual cost of coverage" means "the fair market value of the coverage in a legitimate business transaction," rather than the premium charged to the union by the insurance carrier.

Although the State's money-saving goal is laudable, this court simply cannot rewrite the Health Fund statute in order to drive down the State's expense stemming from the union-sponsored coverage. As discussed above, the Health Fund statute capped the portable funds by limiting them to the lesser of the cost of Health Fund-provided coverage, as determined pursuant to collective bargaining, or the actual cost of the coverage provided by the union. The State is not alleging that the ported funds exceeded the cost of Health Fund-provided coverage. Nor is the State alleging that the ported funds exceeded the actual amounts that the unions paid to the insurance carriers. Instead, the State is suggesting that the unions paid too much for the coverage because of the close ties between the unions and the

insurers. The State's theory of legal liability based on a violation of Chapter 87, however, is untethered from the plain language of the statutes and the State's suggested interpretation is unsupported by the legislative history, except for the general aspiration that the union-sponsored plans might be less expensive than the Health Fund-sponsored plans. Additional limitations, checks, and/or restraints certainly could have been written into the statute, but they were not. Thus, we conclude that the Circuit Court did not err when it interpreted the term "actual monthly cost of coverage," as used in HRS §§ 87-22.3, 87-22.5, 87-23, to mean "the premium charged by and paid to the [insurance] carrier" for the union-sponsored coverage.

B.   Concerns Expressed by the Dissent

The dissent expresses concern that, in enacting Chapter 87, the Legislature did not intend to pay for the cost of premiums that were established fraudulently, were collusively set, or were set in bad faith. We, of course, agree with that proposition. We respectfully must point out, however, that this is not an accurate and fair characterization of the issues before us. Prior to the repeal of Chapter 87, Hawai'i had a statutory scheme that set a limit on funds that could be ported to the unions using the lesser of two measures, the amount determined pursuant to collective bargaining, and the actual cost of the insurance coverage. Although the health benefits plans provided by the unions apparently were no less expensive than the plans provided by the Health Fund, nor apparently were they any more expensive than the plans provided by the Health Fund. With the benefit of hindsight, we can see that this statutory scheme failed to realize the hoped-for savings. However, there is nothing in the statute or legislative history that required the unions to seek the hoped-for savings, or prohibited any particular level of fees and/or profit by the unions' insurers,

or prohibited related-party transactions, or required "bona fide negotiations," bidding, or other procurement procedures.

The premise underlying the State's fraud claim is not whether the premiums were established fraudulently, as is stated repeatedly in the dissent - the unions made no representation as to how the plans were established - but whether the unions fraudulently misrepresented their compliance with the provisions of HRS Chapter 87. The State has not alleged that the requirements of the Hawaii Public Procurement Code, Hawaii Revised Statutes Chapter 103D,[7] were applicable to the unions' provision of health benefit plans under Chapter 87. The State has not asked this court to remand for prosecution of any claim for "fraud," "collusion," or "bad faith",[8] apart from its claims that the amounts ported to HGEA and UPW exceeded the amount permitted by Chapter 87. Requirements that the unions engage in arm's length transactions and pay only "reasonable" administrative fees, and that insurer carriers only make "reasonable" profits, while desirable, were wholly absent from the provisions of Chapter 87. It is not an "absurd result," as the dissent suggests, to decline to create statutory provisions where none exist. The proper remedy, as was ultimately undertaken, was a change in the legislative scheme.

---

[7]    At all times relevant to this case, HRS § 103D-101 (1993), for example, provided that:  "All parties involved in the negotiations, performance, or administration of state contracts shall act in good faith." In 2010, the Hawaiʻi Public Procurement Code was substantially rewritten to more specifically require ethical conduct in public procurement, including the mandate for public employees to:  (1) "[r]emain independent from any actual or prospective bidder, offeror, contractor, or business;" (2) "[i]dentify and maximize efficiencies in the public procurement process;" (3) "[e]nsure economic competition[;]" (4) "[a]void the intent and appearance of unethical behavior;" and (5) "[i]dentify and eliminate any conflicts of interest." HRS § 103D-101(a)(2),(3),(5),(6),(7) & (11) (Supp. 2011).

[8]    The Hawaiʻi Supreme Court has expressly held that it does not recognize a tortious cause of action for "bad faith" outside of the context of an insurer's dealings with the claims of its insured. See, e.g., Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. Partnership, 115 Hawaiʻi 201, 229-30, 166 P.3d 961, 989-90 (2007).

C.    Second Amended Complaint & Alleged Discovery Errors

The State contends that the Circuit Court erred when it denied the State leave to file a second amended complaint and rewrote the State's complaint.  Before considering the parties' arguments, we must consider whether, in light of our rejection of the State's interpretation of the "actual cost of coverage," this issue is moot.

On July 9, 2008, the Circuit Court entered the Summary Judgment Order, denying the State's motion for summary judgment and rejecting the State's interpretation of the statutes in question.  In this order, in the interest of "judicial economy, efficiency, integrity and consistency of ruling," the Circuit Court also granted summary judgment against the State and in favor of all defendants, interpreting the term "actual monthly cost of coverage," as used in HRS §§ 87-22.3, 87-22.5, and 87-23, to mean "the premium charged by and paid to the carrier." Thereafter, with the resolution of the issue of payment of certain fees and costs, the Circuit Court entered a final judgment, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 58, which concluded that there were no remaining parties or issues.

The State does not argue, nor does it appear from the record, that the State's proposed second amended complaint would have survived the summary judgment ruling which is affirmed herein.  In its opening brief, the State represents that "the only difference between the second amended complaint (3rd ed.) (which the court struck) and the third amended complaint (which the court allowed) is the statutory definition."  On appeal, the only challenge posed by the State to the entry of summary judgment against the State involves the statutory definition. Thus, even if the Circuit Court improperly rejected and edited the State's second amended complaint, in light of our affirmation of the Circuit Court's statutory definition, there is no

effective remedy available to the State, and this issue is no longer justiciable. See, e.g., Kaho'ohanohano v. State, 114 Hawai'i 302, 332, 162 P.3d 696, 726 (2007)(citations omitted) (the dispute "must remain alive throughout the course of litigation to the moment of final appellate disposition to escape the mootness bar"); Life of the Land v. Burns, 59 Haw. 244, 250, 580 P.2d 405, 409 (1978) (citation, internal quotation marks and brackets omitted) ("[an appellate court] may not decide moot questions or abstract propositions of law); see also Wong v. Board of Regents, Univ. of Hawaii, 62 Haw. 391, 395, 616 P.2d 201, 204 (1980) ("Courts will not consume time deciding abstract propositions of law or moot cases, and have no jurisdiction to do so.") (citation omitted).

Similarly, because this case will not be remanded for further proceedings on the State's claims, the errors alleged in the Circuit Court's order granting in part the motions to compel filed by Royal State, HGEA, and UPW are moot and need not be addressed.

D.      The Fees and Costs Related to the Biggs' Discovery

The State contends that the Circuit Court abused its discretion when it denied entirely the State's request for reimbursement for the time spent by Samuel Biggs (**Biggs**), the State's expert, preparing for his deposition by Royal State. We agree.

HRCP Rule 26(b)(5)(C) provides, in relevant part:[9]

> Unless manifest injustice would result, [] the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision[.]

Although neither party cites, and we did not find, any Hawai'i cases discussing this provision, numerous other courts have addressed the parallel federal rule, now found at Federal

---

[9]      The second part of HRCP(b)(5)(C) pertains to discovery from non-testifying witnesses. Biggs was an expert who was anticipated to be called by the State as a witness at trial.

Rules of Civil Procedure (**FRCP**) Rule 26(b)(4)(E) (formerly FRCP Rule 26(b)(4)(C)). The majority view is that a reasonable fee for an expert's deposition preparation time is compensable. <u>See</u>, e.g., <u>Waters v. City of Chicago</u>, 526 F.Supp.2d 899, 900 (N.D. 2007); <u>Fleming v. U.S.</u>, 205 F.R.D. 188, 190 (W.D. 2000); <u>Packer v. SN Serv. Corp.</u>, 243 F.R.D. 39, 42 (D. Conn. 2007); <u>New York v. Solvent Chemical Co.</u>, 210 F.R.D. 462 (W.D.N.Y. 2002) (cases cited by the State); <u>see</u> <u>also</u>, e.g., <u>Knight v. Kirby Inland Marine Inc.</u>, 482 F.3d 347, 356 (5th Cir. 2007); <u>Boos v. Prison Health Servs.</u>, 212 F.R.D. 578, 579-80 (D. Kan. 2002); <u>Collins v. Village of Woodridge</u>, 197 F.R.D. 354, 357-58 (N.D. Ill. 1999) (cases cited by the Royal State Group).

Although we conclude that the Circuit Court abused its discretion in denying <u>any</u> reimbursement of Biggs's fees for time spent in preparation for his deposition, on remand the Circuit Court may use its discretion to determine a reasonable fee including but not limited to the reasonableness of the amount of Biggs's time spent in preparation.[10]

The State also contends that the Circuit Court abused its discretion when it granted only $6,235.60 of the $36,604.61 that the State requested for responding to Royal State's second request for production of documents, which sought a significant volume of electronic documents and files, including the associated metadata. Although we recognize the unique considerations, complexity, and added expense associated with electronic discovery, unlike the FRCP, the HRCP provides no specific guidance to trial judges concerning the discovery of electronically-stored information. In this case, the Circuit Court carefully considered motions by both the State and the Royal State Group, including representations, communications, and

---

[10] On appeal, the State has waived its request for reimbursement for Biggs's assistant's time spent aiding Biggs with his deposition preparation. Therefore, only Biggs's preparation time need be revisited on remand.

arguments presented by the parties concerning the nature, extent, burden, and necessity of the subject discovery. Upon careful review of the record, while recognizing that the Circuit Court would have been well within its discretion to award a more substantial part or even all of the State's requested costs, we cannot conclude that the Circuit Court abused its discretion in limiting its award to the specified amount.

E.    The Defendants' Cross-Appeals

HGEA, UPW, and the Royal State Defendants each contend that the Circuit Court abused its discretion when it denied their requests for an award of attorneys' fees and costs. Attorneys' fees and costs were sought based on HRS § 607-14 (allowing attorneys' fees in an action in the nature of assumpsit), HRS § 607-14.5 (permitting an award of attorneys' fees based on bad faith frivolous claims), and/or HRCP Rule 11 (permitting attorneys' fees as sanctions for frivolous filing(s)).

The complaints filed by the State in this case did not include any claims in the nature of assumpsit. Although the State attempted to include an assumpsit claim, the Circuit Court disallowed it, instead requiring the parties to litigate only, in the first instance, the State's entitlement to review and audit HGEA, UPW and the Royal State Group's records related to the public funds ported from the Health Fund to the unions and, in the second instance, the statutory interpretation question. Thus, the Circuit Court did not err when it declined to award attorneys' fees and costs pursuant to HRS § 607-14.

A frivolous claim is "manifestly and palpably without merit, so as to indicate bad faith on the pleader's part such that argument to the court was not required." Coll v. McCarthy, 72 Haw. 20, 29, 804 P.2d 881, 887 (1991); see also Taomae v. Lingle, 110 Hawai'i 327, 332, 132 P.3d 1238, 1243 (2006) (erroneous interpretation in a case of first impression, without more, is not frivolous). In this case, although the State's

interpretation of Chapter 87 was not adopted, we cannot conclude that it was so manifestly and palpably without merit as to indicate bad faith on its part. The Circuit Court did not abuse its discretion when it concluded that the State's claims were not frivolous.

V.    CONCLUSION

As set forth above, we affirm the Circuit Court's September 29, 2008 Judgment Against Plaintiffs with respect to its interpretation of the term "actual monthly cost of coverage" in HRS §§ 87-22.3, 87-22.5, 87-23 to mean "the premium charged by and paid to the carrier." Therefore, we do not reach the issues raised concerning the State's proposed second amended complaint or the Circuit Court's rulings on Royal State, UPW, and HGEA's motions to compel. We also affirm the Circuit Court's September 29, 2008 Judgment Against Plaintiffs with respect to the costs awarded to the State in conjunction with Royal State's second request for production of documents and the denial of Royal State, UPW, and HGEA's requests for attorneys' fees and costs. We vacate the Circuit Court's September 29, 2008 Judgment Against Plaintiffs with respect to the denial of any reimbursement for the time spent by the State's expert preparing for his deposition by Royal State and remand the case for a determination of a reasonable fee for Biggs's deposition preparation.

DATED:   Honolulu, Hawai'i, February 27, 2013.

On the briefs:

Deirdre Marie-Iha
Deputy Solicitor General
for Plaintiffs-Appellants,
Cross-Appellees

James E.T. Koshiba
Charles A. Price
(Koshiba Agena & Kubota)
for Defendant-Appellee,
Cross-Appellant Hawaii
Government Employees
Association, AFSCME Local
No. 152, AFL-CIO

Adrian W. Rosehill
Alan J. Ma
(Stubenberg & Durrett)
for Defendant-Appellee,
Cross-Appellant United
Public Workers, AFSCME
Local No. 646, AFL-CIO

Paul A. Schraff
(Dwyer Schraff Meyer
   Grant & Green)
for Defendants-Appellees,
Cross-Appellants Royal
State Corporation, Royal
State National Insurance
Company, Limited, The Royal
Insurance Agency, Inc.,
Voluntary Employees' Benefit
Association of Hawaii and
Management Applied Programming,
Inc.

Presiding Judge

Associate Judge